

**Dated: December 21, 2017**

**The following is ORDERED:**

Sarah A Hall
United States Bankruptcy Judge

_____

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| STEPHEN C. THOMPSON, | ) | Case No. 14-12865-SAH |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| JAMES HATFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 14-01081-SAH |
| | ) | |
| STEPHEN C. THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On August 9, 2017, the Court conducted a trial on the complaint filed on September 10,

2014 [Doc. 1] (the "Complaint"), by plaintiff James Hatfield against debtor Stephen Thompson.

Phillip Wayne Hatfield, as Personal Representative of the Estates of James Carl Hatfield, Jr.

(original plaintiff), and Wanda Marie Hatfield (original plaintiff's wife), was substituted as

plaintiff by order entered October 26, 2016 [Doc. 47].  Attorney Kris Ted Ledford appeared on

behalf of Phillip Hatfield, and attorney Timothy D. Kline appeared on behalf of debtor and

defendant Stephen Thompson.

## JURISDICTION

The Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1334(b), and

venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper

pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C.

§ 157(b)(2)(I).  The parties consent to entry of judgment by this Court.

## INTRODUCTION AND HISTORY OF THE CASE

Debtor Stephen Thompson ("Thompson") owned a limited liability company, which was

licensed to operate a nursing home in McLoud, Oklahoma.  James Hatfield's wife, Wanda

Hatfield, became a resident of the nursing home in 2008 and died there in 2009 as a result of

substandard care.  James Hatfield filed suit in state district court in 2011 against the limited

liability company operating the nursing home and later joined Thompson individually as a

defendant.  In July 2014, when the matter was set for trial, Thompson filed his chapter 7 petition.

As a result, James Hatfield secured a $1,000,000 uncontested judgment[1] against only the limited

liability company, which had no funds from which it could be satisfied.  Thereafter, he filed this

adversary proceeding in Thompson's bankruptcy case seeking to hold Thompson personally

---

[1]The judgment consisted of $750,000 in actual damages, and $250,000 in punitive
damages for reckless and malicious conduct.  Exhibit 53.

liable on the nursing home's judgment debt, as well as to have such debt determined nondischargeable pursuant to 11 U.S.C. § 523(a)(2).[2]

On May 15, 2015, Thompson filed the Motion of Defendant Stephen Thompson for Summary Judgment and Supporting Brief [Doc. 19] (the "Motion"), and James Hatfield[3] filed the Plaintiff's Response to Defendant's Motion for Summary Judgment [Doc. 26] on June 16, 2015 (the "Response"). The Court granted the Motion by order entered July 8, 2015 [Doc. 28] (the "Summary Judgment Order"), and James Hatfield appealed to the Bankruptcy Appellate Panel for the United States Circuit Court of Appeals for the Tenth Circuit (the "BAP") on July 22, 2015. The BAP reversed and remanded this Court's Summary Judgment Order by opinion dated August 19, 2016 ("Hatfield opinion or decision"),[4] relying heavily on the United States Supreme Court's decision in Husky Int'l Elec., Inc. v. Ritz, 136 S.Ct. 1581 (2016) ("Husky"), which was issued on May 16, 2016.[5]

In making its Findings of Fact and Conclusions of Law, the Court considered:

1.    The Final Pretrial Order [Doc. 59] (the "Pretrial Order"), entered on August 3, 2017;

---

[2]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

[3] James Hatfield died in June 2016, and Phillip Hatfield ("Hatfield"), his son, was substituted as plaintiff in this proceeding.

[4]Hatfield v. Thompson (In re Thompson), 555 B.R. 1 (10th Cir. BAP 2016).

[5]See Hatfield, 555 B.R. at 8, n.37 ("The Supreme Court decided Husky after the bankruptcy court issued the Order at issue in this appeal. We rely heavily on Husky in deciding to reverse.").

2.      The trial record, including exhibits introduced by Hatfield and admitted by the Court,[6] and the testimony of Thompson, Janet Swisher ("Swisher"),[7] James Joslin ("Joslin"),[8] and Hatfield;

3.      Plaintiff's Closing Argument, filed on September 8, 2017 [Doc. 66]; and

4.      Defendant's Closing Argument and Supporting Brief, filed on September 8, 2017 [Doc. 67].

## FINDINGS OF FACT

1.      For several generations, Thompson's family has been part-owner and operator of Bellevue Nursing and Rehabilitation Center ("Bellevue"), a facility in Oklahoma City, Oklahoma.  Thompson testimony.

2.      Thompson has worked in the nursing home industry at least since he was 14 years old.  Thompson testimony.

3.      Thompson obtained an Oklahoma Nursing Home Administrator's License in 1989 and has maintained his license since that time.  Thompson testimony; Exhibit 16.

4.      From 1991 to 1996, Thompson worked at Northwest Nursing Home, a facility owned primarily by his brother David Thompson by way of a corporate entity, Bellecare, Inc.  At the time, Thompson owned 14.29% of Bellecare, Inc.  Thompson testimony; Exhibits 16 & 17.

---

[6]Thompson did not seek to have any exhibits admitted at trial, and therefore, any reference to "Exhibit" is to a Hatfield exhibit.

[7]Swisher was an Oklahoma licensed nursing home administrator and had oversight responsibilities for several nursing homes, including the one owned by Thompson in McLoud, Oklahoma.

[8]Joslin is a service director for the Health Resources Development Service of the Oklahoma State Department of Health.

5.     Since 1996, Thompson has been employed by Bellevue on a full-time basis, but has not been the primary or designated licensed administrator of the facility.  His duties and responsibilities at Bellevue include marketing the facility, giving tours to prospective residents and their families, and assisting families of the residents when problems arise.  Thompson testified he enjoyed working in the nursing home industry, especially developing a comradery with the residents that gave him the opportunity to learn their history and to laugh and cry with them. Thompson derives income of approximately $4,200 per month from his employment at Bellevue.  Thompson testimony.

6.     Thompson's brother, Norman Thompson, is the main administrator for Bellevue. In addition to Thompson and his brother, Thompson's sister, four of his nieces, and two of his nephews are all employed at Bellevue.  Thompson testimony.

7.     Swisher has been a Registered Nurse since 1995.  She obtained a nursing home administrator's license from the state of Missouri in 1998 or 1999 and worked for/with Tracey Smith, the clinical director of a nursing home facility in Missouri known as Health Systems. Swisher testimony.

8.     Through various corporate entities, Tracey Smith and his wife, Denise Smith (the "Smiths"), purchased numerous nursing home facilities in the Oklahoma City area, with financing from First Commercial Bank, that they then leased to nursing home operators. Thompson testimony; Swisher testimony.

9.     Tracey Smith introduced Swisher to David Thompson, who offered her the opportunity to manage four nursing homes licensed to him in the Oklahoma City area.  Swisher testimony.

-5-

10.     David Thompson did not own the physical facilities where he operated the nursing homes.  Instead, he owned the corporations that leased the premises (from the Smiths and/or their corporate entities), and was instrumental in obtaining the Certificates of Need ("Certificate" or "Certificates") from the Oklahoma State Department of Health (the "Health Department"), which are required in order to operate nursing home businesses.  For obtaining the Certificates, David Thompson was paid a monthly amount from each nursing home.  Thompson testimony.

11.     Swisher moved to Oklahoma and began managing David Thompson's four separate nursing homes in approximately 2005.  She also obtained an Oklahoma nursing home administrator's license.  Swisher testimony.

12.     Sometime in the mid-2000's, Thompson was approached by his brother David Thompson who offered him the same type of "business opportunity" he had with respect to his four nursing homes, i.e., to obtain the required Certificate from the Health Department in exchange for monthly payments from the nursing homes, with Swisher overseeing their operation.  The first "opportunity" was with respect to the Edwards Redeemer Nursing Center in Oklahoma City.  Thompson formed a limited liability company, obtained the Certificate, and hired Swisher and her team to oversee/operate the nursing home.  In exchange, he received $1,500 per month from the nursing home operations.  Thompson testimony.

13.     After Thompson acquired the license for Edwards Redeemer Nursing Center, David Thompson came to him again with three more similar "opportunities," with respect to nursing homes to be leased from Tracey Smith, Denise Smith, and/or their corporate entities.  One of those three nursing homes was located in McLoud, Oklahoma, and is the nursing home

involved in this case against whom Hatfield obtained the $1,000,000 judgment.  Thompson testimony; Exhibit 53.

14.    Promise McLoud, LLC ("Promise McLoud") is a limited liability corporation organized under the laws of the State of Oklahoma on February 21, 2008.  Stipulated Fact ¶ 1.

15.    Thompson is the 100 percent owner and managing member of Promise McLoud.  Thompson testimony.

16.    Thompson formed Promise McLoud to obtain a Certificate from the Health Department and become the operator of an existing nursing home in McLoud, Oklahoma, which was to be purchased by Cloud Properties, LLC ("Cloud Properties") (owned 100% by Denise Smith).  In exchange for obtaining the Certificate, Thompson was entitled to receive $1,500 per month from the nursing home operations.  Thompson made no initial capital investment in Promise McLoud.  Thompson testimony; Exhibit 17.

17.    On or about June 13, 2008, Cloud Properties, as prospective purchaser of real estate and nursing home assets, and Promise McLoud, as proposed lessee and licensee, filed a Certificate Application with the Health Department.  Stipulated Fact ¶ 2; Exhibits 17 & 18.

18.    At the time Promise McLoud applied to the Health Department for a Certificate, Thompson set forth various activities in which he intended to be involved in the future operations of the nursing home and objectives he intended to accomplish (collectively, the "Representations").  Thompson testimony.

19.    The Representations included the following:

   a.    He would spend a minimum of eight hours per month at the facility and be present at least every other week.  Exhibits 12 & 13.

-7-

b.      He would inform the Health Department regarding changes in staffing and leadership at the facility during the first six months of operation. Exhibits 12 & 14.

c.      He would determine governing policies that affect the financial performance or quality of care of the facility, and he would, together with the administrator and director of nursing, review and evaluate existing polices and decide whether to retain the current policies or to implement new policies. Exhibit 12.

d.      In conjunction with the administrator and director of nursing, he would determine the staffing needs of the nursing services department necessary to meet the total nursing needs of the residents and regulatory requirements. Exhibit 12.

e.      He would oversee implementation of an operational budget to be approved and monitored by him.  Exhibit 12.

f.      He would review monthly director of nursing reports.  Exhibit 12.

20.    The Health Department considered Thompson's Representations in the Application of Promise McLoud for a Certificate to be important to its analysis and relied on them in granting the Certificate.  Stipulated Fact ¶ 3.

21.    A Certificate was issued on August 27, 2008, to Promise McLoud, L.L.C., d/b/a McLoud Nursing Center ("McLoud Nursing Center") to operate a nursing home in McLoud, Oklahoma, which commenced nursing home operations on or about October 1, 2008.  Stipulated Fact ¶ 4.

22.     Effective on or about October 1, 2008, Promise McLoud employed Swisher to oversee all operations of McLoud Nursing Center.  Stipulated Fact ¶ 5.

23.     At the time of her employment by Thompson, Swisher was an Oklahoma licensed administrator and supervised the administrators of several nursing homes.  She had been a licensed registered nurse for more than twenty-four years and had worked in the administration and operation of nursing homes for more than fifteen years.  Stipulated Fact ¶ 6.

24.     Thompson believed Swisher was more qualified and experienced to run a nursing home than he was.  Thompson testimony.

25.     Swisher had a "team" of employees to help her manage the Thompson nursing homes, including McLoud Nursing Center.  The team included three quality assurance (QA) nurses, a financial manager, and a business/payroll manager.  Additionally, in accordance with the operating plan, Swisher contracted with consultants to provide services, including a medical director, a dietary consultant, and a pharmacy consultant.  Swisher testimony; Exhibit 12.

26.     Swisher, together with her team, fulfilled the obligations Thompson had stated he would perform in the Representations made to the Health Department during the Certificate Application process.  Swisher testimony.

27.     The Health Department was not officially notified that Swisher, rather than Thompson, was the person actually overseeing the management and operation of McLoud Nursing Center.   Thompson testimony; Swisher testimony.

28.     Thompson testified that he did not know he should have notified the Health Department about leadership/staffing changes because there had been no change in the

designated administrator or director of nursing for McLoud Nursing Center.  Thompson
testimony.

29.     Swisher represented Promise McLoud/McLoud Nursing Center in all interactions
with the Health Department.  The Health Department never voiced any concerns or objections
about her apparent supervision or oversight of McLoud Nursing Center.   Swisher testimony.

30.     In her capacity as a nursing home administrator or supervisor (since 1998 or
1999), Swisher never had any complaints filed, or disciplinary action taken, against her in
Missouri.  Swisher had one complaint reported in Oklahoma, but no fault was ever assigned to,
nor any disciplinary action taken against, her.  Swisher testimony.

31.     The lease agreement between Cloud Properties and Promise McLoud regarding
McLoud Nursing Center was submitted to the Health Department as part of the Certificate
Application process and required Promise McLoud to maintain at least $500,000 in "occurrence
based" liability insurance.  Exhibit 30; Thompson testimony.

32.     Promise McLoud maintained a $1,000,000 "claims made" liability insurance
policy rather than occurrence based liability insurance.  Exhibit 31; Thompson testimony.

33.     Other than the lease agreement with Cloud Properties, no evidence was presented
regarding any other requirement that Promise McLoud maintain occurrence based, rather than
claims made, liability insurance.

34.     Promise McLoud's liability insurance policy required written notification as soon
as reasonably practicable after an occurrence which may lead to a claim; if notice was given, then
the claim would be deemed made when notice was received.  Exhibit 31.

35. Swisher eventually supervised the operations of eight nursing homes for the Thompsons. Four of them were licensed to entities owned by David Thompson, including Northwest Nursing Center and Whispering Pines Nursing Center. The other four nursing homes, including McLoud Nursing Center, were licensed to entities owned by Thompson. Thompson testimony; Swisher testimony.

36. Each of the Thompsons' nursing homes, including McLoud Nursing Center, had its own separately designated licensed administrator, who under state regulations, was ultimately responsible for managing the nursing home. Each nursing home also had its own director of nursing. Swisher was never designated administrator for McLoud Nursing Center. Swisher was, for at least a portion of the relevant time period, the designated administrator for David Thompson's Whispering Pines Nursing Center. Swisher testimony; Exhibit 12.

37. At some point, the Center for Medicare and Medicaid Services ("CMMS") instituted an enforcement action against David Thompson's Northwest Nursing Center for noncompliance with federal Medicare and Medicaid requirements, and a systems improvement agreement was entered into on June 25, 2008. On October 9, 2008, Northwest Nursing Center voluntarily ceased participation in the Medicare program under threat of involuntary termination and was subject to denial of payment and imposition of civil penalties by CMMS. David Thompson eventually sold Northwest Nursing Center. Exhibits 21 & 22; Swisher testimony.

38. In October 2008, the Health Department determined that David Thompson's Whispering Pines Nursing Center was not in substantial compliance with federal Medicare and Medicaid requirements. Ultimately, Whispering Pines Nursing Center voluntarily ceased participation in the Medicare program, effective February 11, 2009, under threat of involuntary

-11-

termination.  Whispering Pines Nursing Center was also subject to denial of payment and imposition of civil penalties by CMMS and closed in March 2009.  Exhibits 23 through 29; Swisher testimony.

39.    The Health Department service director Joslin testified that, had Swisher applied for the Certificate, or been designated as manager of McLoud Nursing Center, it may not have issued the Certificate.  Any problems at Northwest Nursing Center or Whispering Pines Nursing Center it knew of at the time of Promise McLoud's Certificate Application would have been taken into consideration.  The Health Department will not approve an operator or manager who has a history of noncompliance, which is defined as three findings of nonstandard care, but a decision to deny the license could only be done after a full hearing and due process was afforded to the applicant.  Joslin testimony.

40.    It was suggested, but not definitively proven, that the Health Department had made three findings of substandard care at David Thompson's Whispering Pines Nursing Center, where Swisher was designated administrator.  Swisher testimony; Joslin testimony.

41.    In October 2008, Wanda Hatfield ("Mrs. Hatfield") became a resident at McLoud Nursing Center.  She died there on September 2, 2009.  Stipulated Fact ¶ 7.

42.    In choosing the McLoud Nursing Center, Mrs. Hatfield's family relied upon the fact that it was licensed by the State of Oklahoma.  Stipulated Fact ¶ 8.

43.    Thompson did not work at McLoud Nursing Center.  Stipulated Fact ¶ 9.

44.    To his knowledge, Thompson did not have any contact or communication with Mrs. Hatfield or Hatfield.  Stipulated Fact ¶ 10.

-12-

45.    Thompson never provided resident care to Mrs. Hatfield or any other patient at McLoud Nursing Center.  Stipulated Fact ¶ 11.

46.    Thompson did not make the Representations to Hatfield or Mrs. Hatfield, and neither Hatfield nor Mrs. Hatfield knew of the existence of the Representations made by Thompson to the Health Department when making the decision to move into McLoud Nursing Center.  Stipulated Fact ¶ 12.

47.    Thompson admitted he did not fulfill the obligations set forth in the Representations, notwithstanding that he knew they were important.  Thompson testimony.

48.    Thompson's contact and communication with Swisher was almost solely through his brother David Thompson.  Swisher communicated daily with David Thompson, who communicated almost daily with Thompson.  As a result, in Swisher's opinion, Thompson was "overseeing" operations at McLoud Nursing Center.  Thompson testimony; Swisher testimony.

49.    Assuming McLoud Nursing Center operated for a period of 30 months, Thompson would have been entitled to receive monthly payments of $1,500 totaling $45,000.  Thompson testimony.

50.    The Bank of Oklahoma ("BOK") records of Promise McLoud for the relevant time period show that the total amount of checks issued to Thompson or checking withdrawals for his benefit were $57,253.70.  Exhibits 40 & 41.

51.    The usual amount of the checks written to Thompson from Promise McLoud was $625.10, generally twice per month.  However, there were five other transactions in the higher amounts of $10,000, $5,000, $6,000, $10,000, and $2,500.  Exhibits 40 & 41.

52.     According to both Thompson and Swisher, any funds Thompson received from Promise McLoud in excess of his normal monthly payment were a return of funds Thompson personally contributed to Promise McLoud to insure that payroll at McLoud Nursing Center could be made.  Thompson testimony; Swisher testimony.

53.     Hatfield offered no evidence to controvert Thompson's assertions that the excess amounts were repayment of funds advanced to cover McLoud Nursing Center payroll.

54.     According to Thompson, he personally guaranteed a loan from First Commercial Bank to Promise McLoud in the amount of $300,000.  Thompson testimony.  The Court notes that Thompson scheduled a claim on Schedule F for potential liability on a judgment entered against Promise McLoud in favor of First Commercial Bank in March 2011 in the amount of $251,000.  Bky Dkt. 10.[9]

55.     Hatfield offered no evidence to the contrary, nor did he refute Thompson's assertions, regarding the personal guaranty of the First Commercial Bank loan.

56.     In his Complaint, Hatfield alleged Thompson diverted funds from Promise McLoud bank accounts to other businesses owned by him as well as businesses owned by his brother, David Thompson.  Complaint, ¶ 18.

57.     The BOK records of Promise McLoud for the period January 2009 to January 2010 indicate checks were written and/or withdrawals were made in the total amount of $160,800.00 for the benefit of various other entities owned by Thompson or entities owned by David Thompson.  Exhibits 42 & 43.

---

[9]The Court can take judicial notice of the contents of Thompson's bankruptcy schedules. Job v. Calder (In re Calder), 907 F.2d 953, 954 (10th Cir. 1990).

58.     According to Thompson and Swisher, all transfers were for purposes of making payroll at the other Thompson entities, and he did not personally benefit therefrom in any way. The transfers were considered loans that were supposed to be paid back as promptly as possible. Thompson testimony; Swisher testimony.

59.      Hatfield offered no evidence suggesting the transfers to other associated entities were for any purpose other than making payroll or that the transfers somehow personally benefitted Thompson.

60.     Mrs. Hatfield died on September 2, 2009.  Swisher knew the Hatfields were upset and intended to sue but she failed to notify the liability insurance carrier.  She testified that she was not aware of the protocol for reporting the possible claim to the insurance carrier.  Swisher testimony.

61.     McLoud Nursing Center ceased operations in April 2011 when First Commercial Bank obtained a forcible entry and detainer judgment with respect to the physical facility, which was precipitated by the Smiths defaulting on their mortgage payments.  Thompson testimony.

62.     No evidence was introduced to suggest that McLoud Nursing Center did not make its lease payments to the Smiths and/or Cloud Properties.

63.     Thompson cancelled Promise McLoud's liability insurance policy on April 25, 2011.  Thompson testimony.

64.     The state court action against Promise McLoud (CJ-2011-0193, Pottawatomie County, Oklahoma) was filed in April 2011.  Promise McLoud was not served until September 2011, and Thompson was not added as a defendant until December 2012.  Thompson testimony.

65.     According to the claims service organization for McLoud Nursing Center's liability insurer carrier, it was first notified of Hatfield's claim/loss on November 2, 2011. Coverage was denied because the insurance policy was no longer in effect (as of April 1, 2011) and no "tail coverage" had been purchased.  Exhibit 34.

66.     Thompson filed his chapter 7 petition on July 9, 2014.

67.     On July 14, 2014, Hatfield obtained a $1,000,000 default judgment ($750,000 in actual damages and $250,000 in punitive damages) against Promise McLoud in the state court action after Promise McLoud filed a notice of no contest.  Exhibit 53.

68.     Hatfield filed this adversary proceeding on September 10, 2014.

69.     Overall, the Court found Thompson to be credible, though at times he appeared somewhat confused.  His demeanor was subdued, but at the same time tense.  According to Thompson, the inconsistencies between answers he gave at his deposition and his trial testimony were due to the enormous stress he has felt in connection with the state court action against him and Promise McLoud, having to personally file bankruptcy, and this adversary proceeding.

70.     Overall, the Court found Swisher to be credible, though at times she had difficulty recalling various details.  But the Court does not believe Swisher was intentionally evasive and is satisfied that she simply did not remember details from events eight or nine years ago.  Though the Court did not find Swisher to be uncooperative, she was defensive in some respects as she evidently felt that Hatfield's counsel was trying to make her look incompetent.

71.     The Court found Joslin to be a credible witness.

72.     The Court found Hatfield to be a credible witness.

-16-

## CONCLUSIONS OF LAW

In order to prevail on his Complaint, Hatfield must first pierce the corporate veil under Oklahoma law to hold Thompson personally liable for the $1,000,000 judgment entered against Promise McLoud.  Hatfield must then demonstrate that such debt is nondischargeable under Section 523(a)(2)(A) based on Thompson's misrepresentations or actual fraud.  This adversary proceeding came on for trial following the BAP's remand in conjunction with its reversal of the Court's Summary Judgment Order.  In its decision, the BAP relied heavily on the Supreme Court's ruling in Husky, which was decided after the Court's Summary Judgment Order. Therefore, a thorough understanding of Husky and the BAP's Hatfield opinion are necessary. The Court first provides some background by briefly discussing Section 523(a)(2)(A) and summarizing the Supreme Court's Husky decision before reviewing the BAP's Hatfield opinion and its reliance on Husky.  The Court then analyzes relevant Oklahoma corporate veil piercing cases, before applying the law to the facts presented here.

## I.    BACKGROUND

### A.    Nondischargeability Under Section 523(a)(2)(A)[10]

The Bankruptcy Code's fresh start policy "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (citing Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).  Its nondischargeability provisions reflect Congress' decision to exclude certain categories of debts from discharge.  Grogan, 498 U.S. at 287.  Section 523(a)(2)(A), one of the most utilized of these

---

[10]The Court excluded evidence regarding the extent of Mrs. Hatfield's injuries because liability for her injuries was determined by the state court judgment, and this adversary proceeding did not include a claim under Section 523(a)(6) for willful and malicious injury.

provisions, prevents discharge of debts involving a debtor's dishonesty.  "Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate." McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) (quoting In re Mayer, 51 F.3d 670, 674 (7th Cir. 1995)).  A creditor seeking to except a debt from discharge for fraud has the burden of proving each element of Section 523(a)(2)(A) by a preponderance of the evidence.  Grogan, 498 U.S. at 286.

Under Section 523(a)(2)(A), debts may be excepted from discharge if they are for money, property, or services obtained by a debtor's "false pretenses," "false representations," or "actual fraud" (other than a statement respecting the debtor's or an insider's financial condition).  The Tenth Circuit Court of Appeals has not yet been presented with a case requiring it to "draw[ ] distinctions among these phrases."  Diamond v. Vickery (In re Vickery), 488 B.R. 680, 687 (10th Cir. BAP 2013).  Most Section 523(a)(2)(A) adversaries brought to except debts on account of a debtor's fraud involve misrepresentations.  See McClellan, 217 F.3d at 892-93.  Therefore, in the Tenth Circuit, courts have repeatedly held that, to prevail on a claim under Section 523(a)(2)(A), a creditor must prove the following elements:  1) the debtor made a false representation; 2) the debtor made the representation with the intent to deceive the creditor; 3) the creditor relied on the representation; 4) the creditor's reliance was justifiable; and 5) the debtor's representation caused the creditor to sustain a loss.  Johnson v. Riebesell (In re Riebesell), 586 F.3d 782, 789 (10th Cir. 2009); Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996); Cooper v. Lemke (In re Lemke), 423 B.R. 917, 921-22 (10th Cir. BAP 2010).

-18-

In considering Thompson's Motion, the Court concluded Thompson did not make any representations to James Hatfield and/or Mrs. Hatfield, and the debt in question, *i.e.*, the judgment against Promise McLoud for substandard care provided by McLoud Nursing Center, did not represent a debt of Thompson for anything he obtained from Hatfield.  Additionally, the Court concluded that a false representation to Hatfield was an essential element of an Oklahoma fraud claim.  Therefore, the Court granted Summary Judgment to Thompson because the debt does not constitute the type of debt that can be excepted from discharge under Section 523(a)(2)(A).

### B.    The Supreme Court's Husky Ruling

The Supreme Court decided <u>Husky</u> in May 2016, about ten months after Hatfield appealed the Court's Summary Judgment Order to the BAP.  In that case, Husky, a creditor ("Creditor") of  Chrysalis Manufacturing Corporation ("Corporation"), filed suit against Ritz, a director and part-owner ("Director/Owner") of Corporation, seeking to hold him personally liable for Corporation's  debt.  Creditor alleged Director/Owner perpetrated an intercompany-transfer scheme from Corporation to other entities controlled by Director/Owner, which rendered Corporation unable to pay its debt.  Creditor contended the transfer scheme was "actual fraud" for purposes of a Texas law that allows creditors to hold shareholders responsible for corporate debt.  <u>Husky</u>, 136 S.Ct. at 1585.  Director/Owner then filed a chapter 7 petition, and Creditor initiated an adversary proceeding.

In the adversary proceeding, Creditor again sought to hold Director/Owner liable for Corporation's debt and, additionally, to have the debt determined to be nondischargeable.  The fraudulent transfer facts of <u>Husky</u> presented an atypical transaction arguably falling within the

definition of "actual fraud" for purposes of the Section 523(a)(2)(A) exception to discharge.

The case eventually reached the Fifth Circuit Court of Appeals, which did not address the state

law issue regarding Director/Owner's liability to Creditor for Corporation's debt.  Instead, it took

up the determinative question of whether, for purposes of nondischargeability, a

misrepresentation by the debtor is a necessary element of "actual fraud."  The Fifth Circuit

answered that question in the affirmative and found Director/Owner had not made any false

representations to Creditor.  Creditor appealed, and the Supreme Court granted certiorari to

resolve a split of authority among the circuit courts of appeal over whether actual fraud for

purposes of Section 523(a)(2)(A) requires a misrepresentation.  Husky, 136 S.Ct. at 1585-86.

The Supreme Court held that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses

forms of fraud, like fraudulent transfer schemes, that can be effected without a false

representation."  Husky, 135 S.Ct. at 1586.  While such holding is not surprising given the plain

language of Section 523(a)(2)(A), the application of the holding in the Husky scenario was

complicated by the fact that the alleged "nondischargeable debt" did not fit neatly into the

requirement that money, property, services, or credit be "obtained by" actual fraud of the debtor.

In Husky, Corporation was the transferor of the assets and did not initially obtain the debt owed

Creditor as a result of the fraudulent transfers.  But the Supreme Court focused instead on

Director/Owner as the transferee or recipient of the fraudulent transfers.  It opined:

> It is of course true that the transferor does not "obtai[n]" debts in a
> fraudulent conveyance.  But the recipient of the transfer—who, with
> the requisite intent, also commits fraud—can "obtai[n]" assets "by"
> his or her participation in the fraud.  If that recipient later files for
> bankruptcy, any debts "traceable to" the fraudulent conveyance . . .
> will be nondischargable under § 523(a)(2)(A).  Thus, at least
> sometimes a debt "obtained by" a fraudulent conveyance scheme

> could be nondischargeable under § 523(a)(2)(A). Such circumstances may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, but they make clear that fraudulent conveyance are not wholly incompatible with the "obtained by" requirement.

Husky, 136 S.Ct. at 1589 (citations omitted). Although the Supreme Court agreed that the phrase "obtained by . . . actual fraud" requires that the relevant debts "resul[t] from" or be "traceable to" fraud, it rejected the argument that such debts must also "result from fraud *at the inception of a credit transaction*." Husky, 136 S.Ct. at 1589. Because it held actual fraud under Section 523(a)(2)(A) did not require a misrepresentation, the Supreme Court remanded the case to the Fifth Circuit for further proceedings consistent with its opinion.[11]

On remand, it was necessary for the Fifth Circuit to determine whether Director/Owner was liable to Creditor for Corporation's debt under Texas law, i.e., whether the corporate veil could be pierced. The Fifth Circuit held

> that establishing a transfer is fraudulent under the actual fraud prong of [the Texas Uniform Fraudulent Transfer Act] is sufficient to satisfy the actual fraud requirement of veil piercing because a transfer that is made "with the actual intent to hinder delay, or defraud any creditor," . . . necessarily "involves 'dishonesty of purpose or intent to deceive.'"

In re Ritz, 832 F.3d 560, 568 (5th Cir. 2016) (quoting Tex. Bus. & Com. Code Ann. § 24.005(a)(1); Latham v. Burgher, 320 S.W.3d 602, 607 (Tex. Ct. App. 2010)). However, the Fifth Circuit concluded additional findings of fact were necessary and remanded the case to the bankruptcy court. Ritz, 832 F.3d at 563. It directed that if the bankruptcy court concludes Director/Owners's conduct satisfies the actual fraud prong of the Texas Uniform Fraudulent

---

[11]Because the styling of the case name changed upon remand to the Fifth Circuit, the Court will now refer to the case as Ritz.

Transfer Act, and that the actual fraud was for his "direct personal benefit," then he could be held liable for Corporation's debt to Creditor under Texas's veil-piercing statute.  Ritz, 832 F.3d at 569.

Ultimately, the bankruptcy court found that (i) Director/Owner's transfers of over $1,000,000 from Corporation to other entities he controlled were made with actual intent to hinder, delay, or defraud Creditor under the Texas Uniform Fraudulent Transfer Act, which satisfied the "actual fraud" requirement of the Texas veil-piercing statute, Husky Int'l Elec. Inc. v. Ritz (In re Ritz), 567 B.R. 715, 755 (Bankr. S.D. Tex. 2017); and (ii) the fraudulent transfers were made primarily for Director/Owner's personal benefit as required for personal liability under Texas's veil-piercing statute.  Ritz, 567 B.R. at 761.  As a result, the bankruptcy court held that Director/Owner's personal liability for Corporation's debt under the Texas veil-piercing statute was nondischargeable as actual fraud within Section 523(a)(2)(A).  Ritz, 567 B.R. at 765.

The Supreme Court's Husky ruling clearly stands for the proposition that false representations are not required under Section 523(a)(2)(A) and that a fraudulent transfer scheme fits within the definition of "actual fraud" for purposes of the exception to discharge.  Upon remand, the Fifth Circuit and the Texas bankruptcy court ultimately held Director/Owner liable for Corporation's debt under Texas veil piercing law and the Texas Uniform Fraudulent Transfer Act and determined it was nondischargeable.  Therefore, it is now evident that if Hatfield were able to prove a fraudulent transfer scheme on Thompson's part, it is theoretically possible to hold him liable for Promise McLoud's judgment debt and have such debt determined nondischargeable under Section 523(a)(2)(A).  However, the Supreme Court's Husky ruling was

not expressly limited to fraudulent transfers, and as a result, it is still unknown what other "actual fraud" scenarios might give rise to nondischargeable debts under this section.

### C.    BAP's Hatfield Opinion

On appeal of the Summary Judgment Order to the BAP, Hatfield argued the Court erred by "(1) not distinguishing that, while Hatfield's claim against Promise McLoud, LLC was based on negligence, his claim against Thompson was a fraud-based corporate veil piercing claim under Oklahoma law; and (2) by not properly applying the actual fraud exception to discharge under § 523(a)(2)(A)."  Hatfield v. Thompson (In re Thompson), 555 B.R. 1, 8 (10th Cir. BAP 2016). The BAP agreed and reversed and remanded to this Court.

The BAP first opined that the Code "does not require that to except debt arising under state law from discharge under § 523(a)(2)(A) the claimant necessarily must prove fraud under state law,"[12] and that "[c]laims established under state law on grounds other than fraud are not automatically precluded from qualifying for the exception to discharge under § 523(a)(2)(A)."[13] Hatfield, 555 B.R. at 9.   It then concluded:

---

[12]The BAP's conclusion in this regard is based on extrapolations of (i) Brown v. Felsen, 442 U.S. 127 (1979), which held that a creditor is not barred by res judicata [claim preclusion] from establishing nondischargeability of a debt liquidated under a state court judgment that did not contain a finding of fraud; (ii) In re McKendry, 40 F.3d 331, 333 (10th Cir. 1994), which held that the 60-day statute of limitations for filing complaints to determine dischargeability of debts, and not three-year state statute of limitations for fraud, applied to creditor's complaint for determination of nondischargeability of a deficiency judgment under Section 523(a)(2).

[13]For authority to support this conclusion, the BAP cited (i) Tummel & Carroll v. Quinlivan (In re Quinlivan), 434 F.3d 314, 319 (5th Cir. 2005) (holding that a debt established under a state law breach of contract theory of recovery could be excepted from discharge under § 523(a)(2)(A)); and (ii) Kaleta v. Sokolow, 183 B.R. 639, 642 (M.D. Ala. 1995) (holding that the creditor's claim established under a state law breach of contract theory of recovery could be excepted under § 523(a)(2)(A) where the creditor would be time barred from liquidating its claim under a fraud but not a breach of contract theory of recovery).

> Ultimately, the bankruptcy court's application of the legal standard to determine whether there existed a debt under state law of the type that potentially could be excepted from the discharge under § 523(a)(2)(A) was in error. The state law elements of fraud need not necessarily be met to establish that a debt arising under state law is nondischargeable under § 523(a)(2)(A).

Hatfield, 555 B.R. at 10.

Additionally, the BAP concluded there were facts in genuine dispute precluding summary judgment in favor of Thompson on Hatfield's Section 523(a)(2)(A) claim. Hatfield, 555 B.R. at 10. First, the BAP determined there were genuine issues of fact as to whether Thompson had committed actual fraud. Among Hatfield's allegations that remained in controversy were the following: (i) Thompson drained Promise McLoud's assets and diverted those funds to other businesses Thompson or his brother owned; (ii) Thompson acted with fraudulent intent; (iii) Mrs. Hatfield would not have died had Thompson fulfilled the representations made to the Health Department and not drained the bank accounts; and (iv) Mrs. Hatfield's death was a foreseeable consequence of Thompson's actions. The BAP reasoned:

> If proven, such facts together with other relevant facts and circumstances could establish the requisite wrongful intent and conduct sufficiently imbued by deception or trickery to deprive or cheat another of property or a legal right that would allow Hatfield to succeed on his § 523(a)(2)(A) claim. Hatfield thus pleads a set of facts, that if proven, could establish actual fraud under § 523(a)(2)(A).

Hatfield, 555 B.R. at 12.

Second, the BAP determined there was a genuine issue of fact as to whether Thompson obtained money, property, services, or credit by actual fraud. According to the BAP, this element could be met by the monthly payment Thompson received from McLoud Nursing Center or the

fact that the Certificate obtained from the Health Department was a property right that presumably increased the value of Thompson's interest in Promise McLoud.  Hatfield, 555 B.R. at 14.

And third, the BAP determined a genuine issue of fact existed with respect to whether the debt arises from actual fraud, stating:

> The conduct upon which Hatfield's state law veil piercing claim is based is substantially the same conduct underlying Hatfield's claim of actual fraud under § 523(a)(2)(A).  Similarly, in Husky, the conduct that was the basis for the state law fraudulent conveyance claim and the claim for actual fraud under § 523(a)(2)(A) was substantially the same.  Although Hatfield may not have a claim for fraud under Oklahoma law, Hatfield alleges a fraud-based corporate veil piercing claim under Oklahoma law that may arise from actual fraud under § 523(a)(2)(A).

Hatfield, 555 B.R. at 14.  Therefore, the BAP reversed and remanded for further proceedings consistent with its opinion.  The Court has conducted a trial and received written closing arguments from the parties, and is now ready to make its ruling.

## II.    OKLAHOMA LAW OF CORPORATE VEIL PIERCING

Hatfield's Complaint seeks to hold Thompson personally liable for the judgment debt of Promise McLoud by piercing its corporate veil.  Incorporation is the statutory process of creating a completely separate artificial person, with the legally recognized purpose of limiting the liability of its owners.  See Kenkel v. Parker, 362 P.3d 1145 (Okla. 2015).  However, Oklahoma courts recognize the doctrine of disregarding the corporate entity, or "veil piercing," in certain limited circumstances.  Generally speaking, under Oklahoma law, the separate corporate existence, and the protection from liability it affords, may be ignored:  (i) on the basis of alter ego theory; (ii) when incorporation is a design or scheme to perpetrate a fraud; or (iii) when it is used

to defeat an overriding public policy.[14]  Simply put, veil piercing seeks to "impute liability for the acts of the corporation to the responsible persons."  Rogers v. Rahill (Matter of Estate of Rahill), 827 P.2d 896, 897 (Okla. Ct. App. 1991).

Hatfield does not argue Promise McLoud's corporate veil may be pierced on alter ego theory, but instead on the independent bases of "(1) fraud and (2) because it is necessary to protect the rights of third persons and accomplish justice."  Plaintiff's Closing Argument at 3. The Oklahoma Supreme Court has opined that "[b]oth law and equity, when necessary to circumvent fraud, protect the rights of third persons, and accomplish justice, disregard the distinct existence and treat [a corporation and the persons composing it] as identical." Mid-Continent Life Ins. Co. v. Goforth, 143 P.2d 154, 157 (Okla. 1943) (citing Caldwell v. Roach, 12 P.2d 376 (Wyo. 1932)).  Although this language appears subject to broad and open-ended interpretation, ignoring the distinction between a corporation and it owners is an extraordinary remedy to be used sparingly.  Puckett v. Cornelson, 897 P.2d 1154, 1156 (Okla. Ct. App. 1995); Thomas v. Vertigo, Inc., 900 P.2d 458, 461 (Okla. Ct. App. 1995); Kearse v. Varnell, Struck, & Assoc., Inc., 2007 WL 1170598 (N.D. Okla. 2007).

Not surprisingly, Hatfield relies heavily on Fanning v. Brown, 85 P.3d 841 (Okla. 2004), to support his veil piercing argument.  Although the underlying facts are similar to those presented here, in Fanning the Oklahoma Supreme Court was not required to address the ultimate

---

[14]A survey of Oklahoma case law reveals a variety of differently stated "standards" or "formulations" for piercing the corporate veil.  The Court's general categorization here is not intended as an attempt to clarify, synthesize, or explicate these standards.  For discussion of the various standards, see Norwood P. Beveridge, Piercing the Corporate Veil:  The Oklahoma Law of Corporate Alter Egos, Adjuncts, and Instrumentalities, 26 Okla. City U. L. Rev. 503 (2001); Kenneth P. Watt, Piercing the Corporate Veil:  A Need for Clarification of Oklahoma's Approach, 28 Tulsa L.J. 869 (1993), and the cases cited therein.

issue of whether the corporate veil should actually be pierced, but only whether it was error for the trial court to dismiss the complaint for failure to state a claim for piercing the corporate veil.

In <u>Fanning</u>, the guardian of a nursing home resident brought suit for injuries allegedly resulting from the facility's substandard care. The plaintiff's claim was based, in part, on negligence and breach of contract.[15] The plaintiff sought to hold shareholders of the owner/operator of the facility personally liable, arguing the "equitable doctrine of piercing the corporate veil should be invoked to protect the rights of third persons and accomplish justice." <u>Fanning</u>, 85 P.3d at 844. The trial court granted the shareholders' motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief could be granted. On appeal, the Oklahoma Court of Civil Appeals affirmed the trial court's dismissal, concluding that the plaintiff "failed to allege sufficient facts to justify the court disregarding the corporate entity and imputing liability for the acts of the corporation to the shareholders." <u>Fanning</u>, 85 P.3d at 844. After granting certiorari, the Oklahoma Supreme Court reversed, in part, and remanded to the trial court.[16]

The Oklahoma Supreme Court first opined that "[c]ourts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." <u>Fanning</u>, 85 P.3d at 846. It then reviewed the complaint for

---

[15]The plaintiff's claim was also based on statutory violations of the Oklahoma Nursing Care Act and Protective Services for Vulnerable Adults Act, but those types of claims have not been made in this case.

[16]The Oklahoma Supreme Court affirmed the trial court's decision with respect to failure to state a claim under the Oklahoma Nursing Home Care Act. <u>Fanning</u>, 85 P.3d at 846.

sufficiency under Oklahoma's notice pleading standard and found that the plaintiff: (i) "alleged the shareholders used the corporate entity to defeat the public policy of protecting a resident from neglect and abuse, that they failed to secure and maintain liability insurance, and that they allowed [the corporation] to become suspended from doing business within the state;" and (ii) "argued that the public policy of protecting elderly residents is a compelling or overriding reason to disregard the corporate entity and pierce the corporate veil." Fanning, 85 P.3d at 847. Therefore, the Oklahoma Supreme Court held:

> [Plaintiff] has given the defendants fair notice of her claims and the grounds upon which they rest. Whether [plaintiff] can prevail on her claim against the shareholders remains to be seen. However, [plaintiff] must be afforded an opportunity to complete discovery so that the court will have a fully developed factual record to determine the issue. At this stage of the proceedings it does not appear beyond a doubt that [plaintiff] can prove no set of facts in support of her theories of recovery. Accordingly, the trial court erred in dismissing [plaintiff's] petition.

Fanning, 85 P.3d at 848. Further, the Oklahoma Supreme Court opined that the trial court should not have dismissed plaintiff's complaint without giving her the opportunity to amend. In this Court's opinion, the Oklahoma Supreme Court's decision was underscored by its concern for limiting the plaintiff's access to the justice system by dismissing a satisfactorily plead complaint at a preliminary stage. Thus, while Fanning stands for the proposition that it is possible to plead a viable claim for veil piercing on these facts, it provides little guidance about what the plaintiff would be required to prove in order to actually pierce the veil.

Hatfield also points to Thomas as authority for piercing the corporate veil. That case involved the failure of a corporate employer to secure workers' compensation insurance coverage or possess a valid own risk permit as required by Oklahoma statute. The employee obtained a

judgment on a workers' compensation court award, but was unable to recover from the insolvent corporate employer.  As a result, the employee sought to hold the sole owner/director of the corporation personally liable for payment of the judgment.  The trial court granted summary judgment in favor of the owner/director, and the employee appealed.  Thomas, 900 P.2d at 459.

The Oklahoma Court of Civil Appeals first highlighted the statutory mandate "that *every* employer subject to the provisions of the Workers' Compensation Act shall pay scheduled compensation for an employee's disability resulting from accidental employment-related injury without regard to fault," and then emphasized that the "liability for such payment 'is exclusive and in place of all other liability of the employer . . . at common law or otherwise for such injury.'" Thomas, 900 P.2d at 460 (quoting 85 O. S. § 12).  In light of these considerations, the appellate court opined:

> We therefore find the public policy underlying the exclusive remedy provision and expressed in the collection provision of the Act is frustrated if the corporate employer which has failed to ensure compensation as required by law is allowed to circumvent the clear legislative intent of the Act by both violating the Act and using the Act to avoid liability.  In the present case, the corporate employer's failure to secure the payment of workers' compensation awards as required by statute stands as the predicate for enforcement of Thomas' workers' compensation judgment, and Thomas seeks *not to avoid* the provisions of the Workers' Compensation Act.  Rather, Thomas seeks to *compel compliance* with the Workers' Compensation Act by enforcement of her certified Workers' Compensation Court judgment against the president, sole shareholder, and director of a corporation now without assets. Under these circumstances, we find the corporate entity should be disregarded when the failure to do so enables the corporate fiction to be wielded to justify the breach of duty imposed by 85 O.S. § 11, to circumvent the collection provision of § 42, and to defeat the public policy underlying those provisions. Although an extraordinary remedy to be used sparingly, the equitable doctrine of disregarding the corporate entity surely applies to avoid such malfeasance.

-29-

Thomas, 900 P.2d at 461.  The Oklahoma Court of Civil Appeals reversed the trial court's grant of summary judgment, holding "the trial court erred in finding no compelling or overriding reason to disregard the corporate entity under the facts and circumstances of this case[.]" Thomas, 900 P.2d at 461.

Although Thomas remains good law, it has been somewhat tempered by the Oklahoma Supreme Court's decision in Kenkel.  Like Thomas, Kenkel involved an unsatisfied judgment on a worker's compensation award.  The Kenkel facts are similar to those in Thomas, except that the shareholders the employee sought to hold liable in Kenkel were very minor shareholders who were not involved in the operation or management of the corporation.

In Kenkel, the Oklahoma Supreme Court acknowledged the defendant corporation's history of gross mismanagement, but found no evidence that establishment of the corporation was for purposes of avoiding payment of worker's compensation claims.  Therefore, it held that the corporate employer's failure to secure workers' compensation insurance did not render its shareholders personally liable for workers' compensation awards to the employee.  Kenkel, 363 P.3d at 1150.  It further explained:

> To argue that [the shareholders] are liable because public policy must make someone liable is an argument not well taken.  If the corporate veil were pierced under these facts, we would effectively be erasing the doctrine altogether.  If the Legislature chooses to expose shareholders to such liability, it may do so.  Until then, we hold that shareholders cannot generally be held personally liable for the payment of the employee's workers' compensation award.

Kenkel, 362 P.3d at 1150.  In a special concurrence, one justice aptly distilled the Kenkel ruling

to its core, *i.e.*, that the unjust result in this case of having a remedy but no recovery is compelled

by the long-standing law of corporations.  Kenkel, 362 P.3d at 1151.

In sum, while Oklahoma courts have stated that veil piercing is available when "the

separate corporate existence is a design or scheme to perpetuate a fraud," the case law actually

contains little to no guidance on "how to apply the 'fraud-scheme prong' of the alter ego test."

Rahndee Indus. Serv., Inc. v. United States ex rel. I.R.S. (In re Rahndee Indus. Serv., Inc.), 2015

WL 6160288, at *13 (Bankr. N.D. Okla. Sept. 18, 2015).  Likewise, to the Court's knowledge,

Thomas, which is an opinion of the Oklahoma Court of Civil Appeals, and not the Oklahoma

Supreme Court, is the only Oklahoma case to actually pierce the veil under the equitable doctrine

of disregarding the corporate entity on the basis of defeating public policy.  Thus, the parameters

of Oklahoma's exceptions to separate corporate existence are unknown,[17] and in the Court's

perception, it is being asked to plough new ground and expand existing Oklahoma law on

corporate veil piercing.

## III.    APPLICATION OF LAW TO FACTS OF THIS CASE

### A.    Hatfield is Not Entitled to Pierce the Corporate Veil of Promise McLoud.

Hatfield seeks to pierce the corporate veil of Promise McLoud to hold Thompson

personally liable on the judgment debt for substandard care.  The question presented is whether

---

[17]Oklahoma is not alone in this respect.  Veil piercing law has been recognized as
confusing in most all jurisdictions. The list of justifications has been described as "imprecise to
the point of vagueness," and courts have been accused of being "inarticulate to the point of
incoherence in their reasoning in particular 'piercing' cases." See Jonathan Macey & Joshua
Mitts, Finding Order in the Morass:  The Three Real Justifications for Piercing the Corporate
Veil, 100 Cornell L. Rev. 99, 100 (2014).

Thompson's use of a separate corporate existence was a design or scheme to perpetrate a fraud or defeat an overriding public policy. As discussed below, the Court concludes that Hatfield interprets Oklahoma's veil piercing standards far too broadly and, therefore, disagrees that Thompson may be held personally liable for the judgment debt of Promise McLoud.

<strong>1.   Thompson's Misrepresentations to the Health Department Are<br>Not Sufficient to Pierce the Corporate Veil of Promise McLoud<br><u>on the Basis of Fraud</u>.</strong>

Although Hatfield alleged Thompson fraudulently drained Promise McLoud's assets and diverted those funds to other businesses Thompson or his brother owned, he did not prove these allegations at trial. Both Thompson and Swisher testified that the $160,800 in transfers made from Promise McLoud to other Thompson entities were to insure that those nursing home facilities could make payroll for their employees. There is no proof that the funds were used for anything other than paying employees or that Thompson personally benefitted from the transfers in any way. Nor is there any proof that such transfers were made by Promise McLoud with any actual intent to hinder, delay or defraud creditors of Promise McLoud. Thus, the Court concludes there was no fraudulent transfer scheme here that constitutes actual fraud, as was ultimately found in <u>Husky</u>.[18]

As a result, the only set of facts Hatfield proved that allegedly constitute fraudulent conduct are Thompson's Representations made in connection with obtaining the Certificate from the Health Department licensing Promise McLoud to operate McLoud Nursing Center. The

---

[18]Moreover, Hatfield essentially ignored the issue of fraudulent transfers in its Plaintiff's Closing Argument [Doc. 66], perhaps in recognition that he failed to present the necessary evidence to support the existence of fraudulent transfers at trial. Although addressed herein, the Court considers the fraudulent transfer argument claim waived based on its absence from the Closing Argument and the absence of evidence at trial.

Representations involve Thompson's pledge of personal involvement in oversight of McLoud Nursing Center.  <u>See</u> Findings of Fact ¶ 19.  Hatfield asserts Thompson had no intention of performing the oversight functions, notwithstanding that he "*knew* firsthand how important good leadership and oversight is to a nursing home and that the lack of good leadership and oversight will put the health and safety of residents at risk."  Plaintiff's Closing Argument at 8.  During his trial testimony, Thompson acknowledged the importance of good leadership and oversight.  Further, he admitted it was not his intent to personally perform the oversight functions.  Instead, he testified that he intended to hire Swisher to fulfill those duties, a person whom Thompson believed was more qualified than himself.

Hatfield seems to claim that the Health Department would not have issued a Certificate to Promise McCloud had it known of Swisher's role or would not have signed off on the change from Thompson to Swisher as operator.  Additionally, Hatfield suggests that Thompson was aware of this fact and that he intentionally concealed Swisher's involvement.  But the evidence and testimony on the issue of whether Swisher's role would have interfered with Promise McLoud obtaining a Certificate was mixed.  Further, Hatfield did not produce evidence tending to prove Thompson intentionally kept Swisher's involvement from the Health Department.  To the contrary, although Swisher was not disclosed in the Certificate Application submitted to the Health Department in June 2008, and the Health Department was not formally notified of Swisher's role, after McLoud Nursing Center began operations in October 2008, the Health Department's only contact with McLoud Nursing Center was through Swisher, and it never voiced any concerns regarding her operation or oversight.

Nevertheless, Hatfield argues the misrepresentations to the Health Department in connection with the Certificate Application constitute "fraud" enabling him to pierce the corporate veil of Promise McLoud.  However, Oklahoma's veil piercing standard is not merely "fraud"; instead, it is the use of a separate corporate existence as a design or scheme to perpetrate a fraud.  Gilbert v. Sec. Fin. Corp., 152 P.3d 165, 175 (Okla. 2006); Wallace v. Tulsa Yellow Cab Taxi & Baggage Co., 1936 OK 665, 61 P.2d 645, 648 (Okla. 1936).  The Court concludes there is no evidence that Thompson formed Promise McLoud in order to perpetrate a fraud.[19]  Limited liability is a legally recognized purpose of incorporation, and the Court seriously doubts anyone would engage in the nursing home business without the protection of the corporate form.

Additionally, Hatfield's veil piercing argument appears to be premised on the assumption that every misrepresentation or lie is fraud.  The Court disagrees with such assumption.  Although it is surely a broad concept, there is no dispute that the term fraud incorporates a negative intention requirement.  In the words of the Oklahoma Supreme Court:

> Fraud is a generic term which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

Stapleton v. Holt, 250 P.2d 451 (1952).  The Court does not find that Thompson's conduct falls within this definition.

---

[19]Thompson simply used the same operating format used by David Thompson as suggested by David Thompson.  The Court firmly believes Thompson did not form Promise McLoud with intent to perpetrate a fraud.

The Court is aware that, for purposes of contract law, Okla. Stat. tit. 15, § 58 defines actual fraud to include "a promise made without any intention of performing it[.]"  At first blush, Thompson's Representations to the Health Department regarding his personal management of McLoud Nursing Center seem to fall into that category.  But, as the Oklahoma Supreme Court has made clear, it "is not the breach of promise but the ***fraudulent intent*** of the promisor at the time the pledge is made not to perform the promise so made and thereby deceive the promisee," that is relevant.  Citation Co. Realtors v. Lyon, 610 P.2d 788, 790 (Okla. 1980) (emphasis added).  Further, "[t]here is a wide distinction between the nonperformance of a promise and a promise made mala fide, only the latter being actionable fraud."  Citation Co. Realtors, 610 P.2d at 790.

Without an underlying bad purpose, negative intention, or deceptive motivation, it is difficult to elevate a lie or misrepresentation to fraud.  Here, although Thompson may not have intended to personally fulfill the oversight functions at McLoud Nursing Center, he did not intend that the promised oversight would not occur, only that he would hire someone more qualified to perform those duties, which he thought permissible.  His credible testimony was that it is common practice in the industry[20] for an individual to obtain a Certificate and then delegate primary responsibility for oversight to another person.  The Court does not find that Thompson made the Representations to the Health Department in bad faith or with intent to deceive and, therefore, cannot conclude that his conduct was fraudulent.

Moreover, "[i]n a fraud action, damages are rooted in the natural and probable consequences of the acts charged, not by the stand-alone fact that fraud was perpetrated."

---

[20]Thompson had spent the bulk of his life working in the nursing home industry.

Bowman v. Presley, 2009 OK 48, 212 P.3d 1210, 1217 (citing LeFlore v. Reflections of Tulsa,
Inc., 1985 OK 72, ¶ 31, 708 P.2d 1068, 1076; McGuigan v. Harris, 1968 OK 58, ¶ 11, 440 P.2d
680, 682; Sharp v. Keaton, 1926 OK 335, ¶ 0, 245 P. 852 (First Syllabus by the Court)).  Here,
the connection between Thompson's misrepresentations and the resulting damages embodied in
the judgment debt against Promise McLoud is quite tenuous.[21]  If there are doubts as to whether
this would be actionable fraud in its own right, then it should not be permitted as a basis for
piercing the corporate veil.

        In sum, the Court concludes that Thompson did not incorporate Promise McLoud for any
nefarious purpose.  Nor did he make the Representations with any fraudulent intent.  Therefore,
the Court holds that Hatfield cannot pierce Promise McLoud's corporate veil to hold Thompson
personally liable for the judgment debt on the basis of fraud.

### 2.      Thompson Did Not Use the Corporate Form to Defeat Public Policy.

        Likewise, the Court holds that Hatfield cannot pierce Promise McLoud's corporate veil
on the basis of its public policy argument.  As mentioned above, the Oklahoma Court of Civil
Appeal's decision in Thomas is the only Oklahoma case of veil piercing on the basis that a
separate corporate existence has been used to "defeat an overriding public policy."  The Court
does not dispute that protection of elderly and disabled nursing home residents is an important
public policy, but the Court does not view the case before it here as the equivalent of Thomas.
Unlike Thomas, this case does not involve the violation of a mandatory statutory duty to maintain
worker's compensation insurance or any other duty mandated by the legislature.  Further, a

---

[21]The relationship between the Representations and the judgment debt are discussed
further in context of nondischargeability below.

review of cases from other jurisdictions that involve veil piercing on the basis of policy or injustice, a few of which are discussed below, also indicates they are predicated on intentional violations of statutes that impose specific duties or prohibit certain activities.[22]

In <u>Carter-Jones Lumber Co. v. LTV Steel Co.</u>, 237 F.3d 745 (6th Cir. 2001), a corporation engaged in a scheme to hide transformers containing PCB's from the EPA was found liable for violations of the Comprehensive Environmental Response, Compensation, and Liability Act. The Sixth Circuit permitted the corporate veil to be pierced under Ohio law to hold the sole shareholder and director, who exercised significant control over the affairs of the corporation, personally liable on the corporation's judgment.  The Sixth Circuit reasoned:

> Can it be that [a] shareholder is immunized from personal liability if he causes the corporation to commit an illegal act, no matter the degree of his control over the corporation with regard to the illegal act, no matter the harm to third parties, and no matter the other equities? Neither we nor the Ohio courts hold that such immunity exists.

<u>Carter-Jones Lumber Co.</u>, 237 F.3d at 749.

Similarly, <u>Lowen v. Tower Asset Mgmt, Inc.</u>, 829 F.2d 1209 (2[d] Cir. 1987), involved the violation of a federal statute.  In <u>Lowen</u>, a corporate investment manager of a qualified retirement plan was found to have violated ERISA's prohibited transaction statutes that protect against fiduciary self-dealing, which resulted in more than $20 million in losses to the plan.  The Second Circuit held individual shareholders of the corporate investment manager, as well as related corporations, jointly and severally liable with the corporation for restoring the plan's lost profits

---

[22]For more analysis of cases in which courts actually pierce the corporate veil, <u>see</u> Jonathan Macey & Joshua Mitts, <u>Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil</u>, 100 Cornell L. Rev. 99 (2014).

because the individuals and entities acted in concert to cause the prohibited investments. The

Second Circuit stated:

> Neither the separate corporate status of the three corporations nor the
> general principle of limited shareholder liability afford protection
> where exacting obeisance to the corporate form is inconsistent with
> ERISA's remedial purposes. Parties may not use shell-game-like
> maneuvers to shift fiduciary obligations to one legal entity while
> channeling profits from self-dealing to a separate legal entity under
> their control.

Lowen, 829 F.2d at 1220.

Likewise, Love v. State, 972 S.W.2d 114 (Tex. Ct. App. 1998), involved the violation of

a Texas statute. In Love, the Railroad Commission issued a final order assessing penalties

against an oil and gas lease operator for failure to plug inactive wells in violation of the Texas

Natural Resources Code. The State of Texas brought suit to enforce the order and also to hold

shareholders and directors of the corporate operator personally liable. The appellate court

determined that Texas law allows the corporate veil to be pierced "when the patterns of the sham

is such that shareholders of a corporation with unwanted obligations siphon off revenues and sell

assets, or do other acts to hinder the company's ability to pay its debts such as start up a new

business with the same shareholders." Love, 972 S.W.2d at 120. The Love court found that there

was sufficient evidence to conclude that the shareholders manipulated the corporate form to

escape their statutory obligations, which was against public policy. Therefore, it upheld the

jury's verdict that the corporation was a sham used to perpetrate a fraud on the Railroad

Commission. Love, 972 S.W.2d at 120.

The case before the Court here is simply not like Thomas or the other cases described

above as Promise McLoud violated no statutory duty for which Thompson should be held to

account.  The Court acknowledges that the type of insurance carried by Promise McLoud, together with the failure to report Mrs. Hatfield's death in a timely manner, is the primary reason Hatfield has a remedy but is not able to recover damages.  However, Promise McLoud did not fail to maintain insurance.  And although it maintained "claims made" rather than "occurrence based" insurance, there was no statutory duty or legal requirement, other than the lease with Cloud Properties, to maintain a specific type of insurance.  Further, the insurance was only cancelled when McLoud Nursing Center ceased operations, and although there was testimony that McLoud Nursing Center was not very profitable, there was no evidence that the cessation of operations was specifically or directly attributable to conduct on Promise McCloud's part.  Rather, the evidence was that McLoud Nursing Center ceased operations when Bank of Commerce obtained a forcible entry and detainer judgment as the result of Cloud Properties (the Smiths) failing to make the mortgage payments.

As a result, the Court holds that Thompson did not use the corporate form to defeat an important public policy, and therefore, Promise McLoud's corporate veil cannot be pierced on this basis.

**B.    Even Assuming Hatfield Could Pierce Promise McLoud's Corporate Veil, the Judgment Debt Would be Dischargeable.**

In light of the Supreme Court's Husky ruling and similar previous decisions, see, e.g., McClellan, 217 F. 3d 890; Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873 (6th Cir. BAP 2001) and Diamond v. Vickery (In re Vickery), 488 B.R. 680, 687 (10th Cir. BAP 2013), a new formulation of elements for establishing a prima facie case for actual fraud under Section 523(a)(2)(A) is necessary.  Courts have stated that "[i]n order to except a debt from

discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the dispute." Fifth Third Mortg. Co. v. Kaufman, 2017 WL 4021230, *14 (N.D. Ill. July 25, 2017) (quoting Sullivan v. Glenn (In re Glenn), 502 B.R. 516, 531 (Bankr. N.D. Ill. 2013)). Even if the first element were deemed satisfied, the Court finds that neither the second nor third elements are met in this case. Thompson did not possess the requisite fraudulent intent in making the Representations to the Health Department, and Hatfield's debt is not traceable to Thompson's allegedly fraudulent Representations. Therefore, even assuming Hatfield was entitled to pierce the corporate veil making Thompson personally liable for Promise McLoud's judgment debt, the Court holds such debt would nevertheless be dischargeable.

### 1.    Thompson Did Not Possess the Requisite Fraudulent Intent.

The Tenth Circuit's narrow construction of Section 523(a)(2)(A) "limit[s] the harsh result of nondischargeability to 'frauds involving moral turpitude or intentional wrong.'" The Northern New Mexico Orthopaedic Ctr., P.C. v. Auge (In re Auge), 2015 WL 1867894 (Bankr. D. N.M. 2015) (citing DSC Nat'l Prop., LLC v. Johnson (In re Johnson), 477 B.R. 156, 169 (10th Cir. BAP 2012) (quoting Driggs v. Black (In re Black), 787 F.2d 503, 505 (10th Cir. 1986), abrogated on other grounds by Grogan v. Garner, 498 U.S. 279 (1991))). Numerous other courts have also emphasized this point: fraud is an intentional tort, and the common law of fraud has a mental-state requirement. Mayer v. Spanel Int'l Ltd., 51 F.3d 670, 675 (7th Cir. 1995). See also Sauer Inc. v. Lawson, (In re Lawson), 791 F.3d 214, 220 (1st Cir. 2015) (fraud must be actual or positive fraud, not merely fraud implied by law, and debtor must be guilty of intent to defraud);

McClellan, 217 F. 3d at 893 (fraud includes surprise, trick, cunning, dissembling, and any unfair way by which another is cheated).

The debtor's intent to deceive "may be inferred from the totality of the circumstances." Riebesell, 586 F. 3d at 791 (quoting Young, 91 F. 3d at 1375), but "[t]he debtor must have acted with the *subjective intent* to deceive the creditor." DSC Nat'l Prop., LLC v. Johnson (In re Johnson), 477 B.R. 156, 169 (10th Cir. BAP 2012) (citing First Nat'l Bank v. Cribbs (In re Cribbs), 327 B.R. 668, 674 (10th Cir. BAP 2005)). As the party objecting to dischargeability of the debt, Hatfield has the burden of proving Thompson's intent to deceive, and he has not met that burden. Thompson may have made false statements on the Certificate Application and may have been negligent in overseeing the operations of McLoud Nursing Center. Additionally, his faith in Swisher and her team to properly oversee McLoud Nursing Center may have been misplaced, given their responsibility for a total of eight nursing homes. But, even if Thompson's actions or inactions can be considered negligent or reckless, they do not rise to the level of fraudulent conduct without the intent to deceive or to take unfair advantage of or cheat someone. The Court concludes, based on the totality of the evidence before it, that Thompson did not posses the requisite fraudulent intent required by Section 523(a)(2)(A).[23]

---

[23]In finding Thompson did not hold the necessary fraudulent intent required by Section 523(a)(2)(A), the Court is not finding that Thompson is without fault. However, his fault arises from his negligence in blindly trusting and relying on his brother David Thompson who was the mastermind behind the organizational structure and operational plan used by Promise McLoud and McLoud Nursing Center. Such trust was perhaps misplaced but, based on the evidence before the Court, was not motivated by any desire to defraud, cheat or trick anyone. Perhaps David Thompson had this intent, but he was not a party to this litigation and such evidence was not before the Court.

### 2.    The Judgment Debt is Not Traceable to Thompson's Misrepresentations.

In <u>Husky</u>, the Supreme Court made it clear that fraudulent transfer schemes constitute actual fraud for purposes of Section 523(a)(2)(A) nondischargeability, but it did not eliminate the requirement that the debt be "traceable to" or "connected with" the fraud.  First, the Supreme Court stated that Director/Owner's fraudulent transfers fell within the term "actual fraud" because the transfer scheme constituted acts of concealment and hindrance that impaired Creditor's ability to collect its debt.  <u>Husky</u>, 136 S.Ct. at 1587.  Additionally, the Supreme Court recognized that the phrase "obtained by . . . actual fraud" requires that the debts result from or be traceable to the fraud when it stated that if a recipient of a fraudulent transfer later files for bankruptcy, any debts "traceable to" the fraudulent transfer will be nondischargable under § 523(a)(2)(A).  <u>Husky</u>, 136 S.Ct. at 1589.  Previous Supreme Court decisions also emphasize the required relationship between the improper conduct and the debt.  <u>See</u> <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 221 (1998) ("§ 523(a)(2)(A) is best read to prohibit the discharge of any liability ***arising from*** a debtor's fraudulent acquisition of money, property, etc."); <u>Field v. Mans</u>, 516 U.S. 59, 61 (1995) (Code does not discharge debts ***resulting from*** false pretenses, a false representation, or actual fraud).

As the First Circuit Court of Appeals has stated, the statutory language of Section 523(a)(2)(A) "does not 'remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice.'" <u>McCrory v. Spigel</u> (<u>In re Spigel</u>), 260 F.3d 27, 32 (1st Cir. 2001) (quoting <u>Century 21 Balfour Real Estate v. Menna</u>, 16 F.3d 7, 10 (1st Cir. 2001)).  A creditor arguing nondischargeability in an adversary

proceeding must demonstrate the claim arose as a direct result of the debtor's fraud.  Spigel, 260 F.3d at 32.  Further, the Tenth Circuit BAP has opined that "[o]ne of the most fundamental concepts of tort law is 'proximate cause,' which requires a showing that the defendant's conduct led to the plaintiff's injury."  Knaub v. Rollison (In re Rollison), 2013 WL 5797861, *3 (10th Cir. BAP 2013).  Therefore, "[b]ecause Section 523(a)(2) liability is based on tort, in order to establish that a debt is not dischargeable, the creditor must demonstrate that there is a causal nexus between the fraud and the subject debt, i.e. that the damages sustained were in fact caused by the debtor's fraudulent conduct."  Knaub, 2013 WL 5797861, *3.

Here, the relationship between Thompson's Representations to the Health Department and Hatfield's judgment debt against Promise McLoud for McLoud Nursing Center's substandard care are not sufficiently related.  In the Court's opinion, they are only causally connected if one assumes that, but for the Representations, Thompson would not have been granted a Certificate to operate McLoud Nursing Center or that Mrs. Hatfield's death was a foreseeable consequence of Thompson's nonfulfillment of the Representations.  Hatfield proved that the Health Department relied on the Representations, but ultimately was not able to prove the Health Department would not have issued the Certificate to Promise McLoud had it known Thompson would hire Swisher to perform the obligations stated in the Representations.  Neither could Hatfield prove that, if Thompson had made good on the Representations, Mrs. Hatfield would not have died as a result of substandard care.

Additionally, the Court notes that, were it to determine Hatfield's debt was proximately caused by the allegedly fraudulent Representations to the Health Department, then it seems Thompson could be potentially liable for every debt of Promise McLoud, and every such debt

would be nondischargeable, including run-of-the-mill debts like an unpaid electric bill or unpaid invoice of a food vendor.  Section 523(a)(2)(A) nondischargeability is, of course, not that broad and was never intended to reach debts that do not result from a debtor's fraudulent conduct in a more direct manner.

## CONCLUSION

As the Court previously stated in its Summary Judgment Order, the facts presented here are tragic.  The pain suffered by Mrs. Hatfield as a result of McLoud Nursing Center's substandard care, and the angst undoubtedly suffered by her family, are very regrettable. Unfortunately, although this type of tragedy should be a rare occurrence, it is not.  To make matters worse, the Hatfields had a remedy against Promise McLoud and obtained a judgment against it in state court, but were not able to recover the damages awarded.

Hatfield's attempt to hold Thompson personally liable on the judgment debt as owner of Promise McLoud is understandable.  But, limited liability is a legally recognized purpose of incorporation, and the separation between a corporation and its shareholders can only be disregarded in extraordinary circumstances.  The requisite extraordinary circumstances are simply not present in this case.  However negligent or reckless Thompson may have been in making the Representations to the Health Department and in his oversight of McLoud Nursing Center, the Court does not believe, based on its review of the evidence as well as its observations of Thompson during the trial, that he ever intended to deceive, cheat, or take advantage of anyone.  Nor did Thompson violate any mandatory statutory duties.  As the Oklahoma Supreme Court justice pointed out in his <u>Kenkel</u> concurrence discussed above, the perceived unjust result

-44-

in this case of "having a remedy but no recovery" is compelled by the long-standing law of corporations.[24]

Additionally, even if Hatfield were able to pierce the corporate veil of Promise McLoud and hold Thompson personally liable, he has now filed bankruptcy and the debt would be dischargeable.  Section 523(a)(2)(A) only excepts from discharge those debts directly resulting from a debtor's fraudulent conduct.  In the absence of fraud "involving moral turpitude or intentional wrong," Section 523(a)(2)(A) is not applicable.  The Court has concluded Thompson did not make the false Representations to the Health Department with the requisite fraudulent intent.  Further, the Court has concluded that the judgment debt against Promise McLoud based on McLoud Nursing Center's substandard care is not "traceable to" or "causally related" to the Representations Thompson made to Health Department.

Accordingly, judgment must be entered in favor of Thompson and against Hatfield on Hatfield's Section 523(a)(2)(A) claim.

IT IS SO ORDERED.

# # #

---

[24]The Court would note, however, that the $1,000,000 claim filed by Hatfield in Thompson's bankruptcy case is being treated as a liquidated and allowed unsecured claim in the base amount of $350,000.  See Agreed Order on Motion to Compromise Controversy and Brief in Support, Doc. 127 in Case 14-12865.  It is likely that Hatfield will receive some distribution from the estate, but the dividend percentage is not yet known.